# 23-16147

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

## ANTHONY T. DEFRANCESCO

*Plaintiff and Appellant,*

*v.*

## ROBERT C. ROBBINS AND MICHAEL D. DAKE

*Defendants and Respondents.*

————————

Appeal from United States District Court
District of Arizona, Tucson
The Hon. Cindy K Jorgenson
U.S. District Court Case No. 4:20-cv-00011-CKJ

————————

## APPELLANT'S OPENING BRIEF

————————

## MILLER BARONDESS, LLP
Louis R. Miller
David W. Schecter
* Lauren M. Brody
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Tel: (310) 552-4400
Fax: (310) 552-8400

*Attorneys for Plaintiff and Appellant ANTHONY T. DEFRANCESCO*

653883.3

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ............................................................4

ISSUE PRESENTED...................................................................................4

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED...............5

STATEMENT OF THE CASE.....................................................................5

    A.    DeFrancesco Alleged That Respondents Fired Him Because His Husband Spoke Out Against Their Nepotism and Corruption ............5

        1.    Robbins Rigged The Recruitment For The Highest Paid Position At The University Of Arizona Health Sciences ..........6

        2.    DeFrancesco's Husband Reported Robbins's Misconduct To Other University Officials ....................................................9

        3.    Dake Retaliated Against DeFrancesco After Robbins Told Him That Goldman Had Spoken Out Against His Hiring ...............................................................................11

    B.    Procedural History...............................................................14

        1.    The District Court Dismisses DeFrancesco's First Amendment Claim On Qualified Immunity Grounds And For Failure To State A Claim.................................................14

        2.    The Ninth Circuit Reverses And Remands DeFrancesco's First Amendment Claim.........................................................17

        3.    The District Court Again Dismisses The First Amendment Claim On Qualified Immunity Grounds ..............18

SUMMARY OF ARGUMENT ..................................................................23

STANDARD OF REVIEW .......................................................................24

ARGUMENT ............................................................................................25

I.    THE DISTRICT COURT ERRED IN GRANTING APPELLEES QUALIFIED IMMUNITY FOR FIRING DEFRANCESCO IN RETALIATION FOR HIS HUSBAND'S PROTECTED SPEECH ...........25

    A.    The District Court Required Binding Precedent But Qualified Immunity Must Be Denied So Long As Defendants Had Fair

Notice Their Conduct Was Unconstitutional ......................................26

B.  By 2019, A Robust Consensus Of Cases Held That The First
Amendment Prohibits Retaliation Against A Government
Employee For His Family Member's Speech ....................................29

1.  It Is A Matter Of First Principles That The Government
Cannot Retaliate For Free Speech. ...........................................29

2.  For Over Twenty Years, Courts Have Applied Those
First Principles To Plaintiffs That Were Retaliated
Against For Their Family Members' Protected Speech ..........30

3.  The District Court Contravened Supreme Court And
Ninth Circuit Law In Holding Existing Law Was
Insufficient To Clearly Establish That Firing
DeFrancesco Was Unconstitutional ..........................................35

C.  This Is Not The Rare Case Where Qualified Immunity Should
Have Been Decided On A Motion To Dismiss ...................................42

II.  THERE IS NO OTHER BASIS ON WHICH TO AFFIRM THE
DECISION BELOW .......................................................................................46

A.  DeFrancesco Alleged A Plausible First Amendment Retaliation
Claim ....................................................................................................46

B.  The Court Should Also Remand As To President Robbins ...............50

CONCLUSION .......................................................................................................53

STATEMENT OF RELATED CASES (CIRCUIT RULE 28-2.6) ........................54

CERTIFICATE OF COMPLIANCE RULE 32(A)(7)(C).....................................55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adkins v. Bd. of Educ. of Magoffin Cnty., Ky.*,
 982 F.2d 952 (6th Cir. 1993) ............................................................ 3, 15, 31, 32
*Adler v. Pataki*,
 185 F.3d 35 (2d Cir. 1999) .................................................................. 15, 32, 44
*Agostino v. Simpson*,
 2008 WL 4906140 (S.D.N.Y. Nov. 17, 2008) ...................................................34
*Anthoine v. N. Cent. Counties Consortium*,
 605 F.3d 740 (9th Cir. 2010) ...........................................................................48
*Ashcroft v. al-Kidd*,
 563 U.S. 731 (2011) ..........................................................................................28
*Ballou v. McElvain*,
 29 F.4th 413 (9th Cir. 2022) ...................................................................... 47, 48
*Bator v. State of Hawai'i*,
 39 F.3d 1021 (9th Cir. 1994) ...........................................................................38
*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ..........................................................................................24
*Biggs v. Best, Best & Krieger*,
 189 F.3d 989 (9th Cir. 1999) ...........................................................................34
*Blair v. Bethel Sch. Dist.*,
 608 F.3d 540 (9th Cir. 2010) ...........................................................................31
*Blankenhorn v. City of Orange*,
 485 F.3d 463 (9th Cir. 2007) ...........................................................................51
*Board of Directors of Rotary Int'l v. Rotary Club of Duarte*,
 481 U.S. 537 (1987) ..........................................................................................31
*Boyd v. Benton County*,
 374 F.3d 773 (9th Cir. 2004) ...........................................................................51
*Cain v. Tigard–Tualatin Sch. Dist. 23J*,
 262 F. Supp. 2d 1120 (D. Or. 2003) ...............................................................35
*Capp v. County of San Diego*,
 940 F.3d 1046 (9th Cir. 2019) .........................................................................49
*Connick v. Myers*,
 461 U.S. 138 (1983) ..........................................................................................47

3

*Coszalter v. City of Salem*,
   320 F.3d 968 (9th Cir. 2003) ..............................................................38
*Crawford–El v. Britton*,
   523 U.S. 574 (1998)...........................................................................30
*Dahlia v. Rodriguez*,
   735 F.3d 1060 (9th Cir. 2013) ............................................................48
*DeFrancesco v. Arizona Bd. of Regents*,
   Case No. 21-16530, 2023 WL 313209 (9th Cir. Jan. 19, 2023)...........................2
*DePaul Indus. v. Miller*,
   14 F.4th 1021 (9th Cir. 2021) ....................................................... 39, 40
*Desrochers v. City of San Bernardino*,
   572 F.3d 703 (9th Cir. 2009) ....................................................... 16, 17
*DiRuzza v. County of Tehama*,
   206 F.3d 1304 (9th Cir. 2000) ............................................................30
*Ellins v. City of Sierra Madre*,
   710 F.3d 1049 (9th Cir. 2013) ............................................................30
*Eng v. Cooley*,
   552 F.3d 1062 (9th Cir. 2009) ............................................................48
*Estate of Booker v. Gomez*,
   745 F.3d 405 (10th Cir. 2014) ............................................................45
*Evans v. Skolnik*,
   997 F.3d 1060 (9th Cir. 2021) ............................................................39
*Everitt v. DeMarco*,
   704 F. Supp. 2d 122 (D. Conn. 2010)....................................................34
*Fannon v. Patterson*,
   2014 WL 4273337 (S.D. Ohio Aug. 29, 2014) .......................................34
*Freeman v. County of Riverside*,
   2019 WL 7905733 (C.D. Cal. Apr. 5, 2019) ..................................... 3, 20, 22, 33
*Gaines v. Wardynski*,
   871 F.3d 1203 (11th Cir. 2017) ................................................... 21, 26, 38
*Gaspers v. Ohio Dep't of Youth Servs.*,
   648 F.3d 400 (6th Cir. 2011) ............................................................32
*Giebel v. Sylvester*,
   244 F.3d 1182 (9th Cir. 2001) ............................................................37
*Gray v. Bruneau-Grand View Sch. Dist. No. 365*,
   2007 WL 1381785 & n.2 (D. Idaho Mar. 27, 2007)....................................34
*Greisen v. Hanken*,
   925 F.3d 1097 (9th Cir. 2019) ............................................................48

*Groten v. California*,
    251 F.3d 844 (9th Cir. 2001) ...............................................................43

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)............................................................................42

*Harris v. City of Circleville*,
    583 F.3d 356 (6th Cir. 2009) ..............................................................45

*Hartman v. Moore*,
    547 U.S. 250 (2006)............................................................................30

*Hope v. Pelzer*,
    536 U.S. 730 (2002).................................................................. passim

*Hydrick v. Hunter*,
    500 F.3d 978 (9th Cir. 2007) ....................................................... 28, 43

*Isakhanova v. Muniz*,
    2016 WL 1640649 (N.D. Cal. Apr. 26, 2016) ...................... 15, 33, 40

*Johnson v. Duffy*,
    588 F.2d 740 (9th Cir. 1978) ..............................................................51

*Johnson v. Multnomah County*,
    48 F.3d 420 (9th Cir. 1995) ................................................................47

*Johnson v. Riverside Healthcare Sys., LP*,
    534 F.3d 1116 (9th Cir. 2008) ............................................................24

*Karl v. City of Mountlake Terrace*,
    678 F.3d 1062 (9th Cir. 2012) ............................................................48

*Keates v. Koile*,
    883 F.3d 1228 (9th Cir. 2018) ..................................................... passim

*Kisela v. Hughes*,
    138 S. Ct. 1148 (2018) .......................................................................27

*Lanier*,
    520 U.S. ..............................................................................................39

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ..............................................................46

*Lewis v. Eufaula City Bd. of Educ.*,
    922 F. Supp. 2d 1291 (M.D. Ala. 2012) ............................... 15, 20, 31

*Loftus v. Clark-Moore*,
    690 F.3d 1200 (11th Cir. 2012) ..........................................................26

*Lum v. Jensen*,
    876 F.2d 1385 (9th Cir. 1989) ...........................................................27

*Marable v. Nitchman*,
    511 F.3d 924 (9th Cir. 2007) ..............................................................49

*Marsh v. County of San Diego*,
 680 F.3d 1148 (9th Cir. 2012) ............................................39
*Mendoza v. Block*,
 27 F.3d 1357 (9th Cir. 1994) ...................................... 36, 41
*Miranda–Rivera v. Toledo–Davila*,
 813 F.3d 64 (1st Cir. 2016) ..............................................45
*Moonin v. Tice*,
 868 F.3d 853 (9th Cir. 2017) ............................................28
*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
 429 U.S. 274 (1977) ........................................................49
*Mullenix v. Luna*,
 577 U.S. 7 (2015) .............................................................3
*Nailon v. University of Cincinnati*,
 715 F. App'x 509 (6th Cir. 2017) .......................... 22, 32, 40
*Nieves v. Bartlett*,
 139 S. Ct. 1715 (2019) ....................................................30
*O'Brien v. Welty*,
 818 F.3d 920 (9th Cir. 2016) ............................................43
*Oliver v. Fiorino*,
 586 F.3d 898 (11th Cir. 2009) ..........................................26
*P.B. v. Koch*,
 96 F.3d 1298 (9th Cir. 1996) ............................................45
*Perry v. Sindermann*,
 408 U.S. 593 (1972) ........................................................30
*Perry*,
 408 U.S. ................................................................. 30, 44
*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
 391 U.S. 563 (1968) ................................................. 30, 31
*Polanco v. Diaz*,
 76 F.4th 918 (9th Cir. 2023) ..................................... 28, 43
*Roberts v. Ferry County*,
 2008 WL 5121606 (E.D. Wash. Dec. 5, 2008)...................34
*Roberts v. U.S. Jaycees*,
 468 U.S. 609 (1984) ........................................................15
*Robinson v. York*,
 566 F.3d 817 (9th Cir. 2009) ............................................30
*Roe v. City & County of San Francisco*,
 109 F.3d 578 (9th Cir. 1997) ............................................47

*S.B. v. County of San Diego*,
  864 F.3d 1010 (9th Cir. 2017) ................................................................. 39, 40
*Saucier v. Katz*,
  533 U.S. 194 (2001) ..................................................................................... 25, 28
*Schwenk v. Hartford*,
  204 F.3d 1187 (9th Cir. 2000) ........................................................................36
*Serena H. v. Kovarie*,
  209 F. Supp. 2d 453 (E.D. Pa. 2002) ...............................................................35
*Sharp v. County of Orange*,
  871 F.3d 901 (9th Cir. 2017) ..........................................................................41
*Snyder v. Phelps*,
  562 U.S. 443 (2011) ........................................................................................31
*Sorrels v. McKee*,
  290 F.3d 965 (9th Cir. 2002) ..........................................................................28
*Sowards v. Loudon County*,
  203 F.3d 426 (6th Cir. 2000) .......................................................... 20, 32, 33, 44
*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ........................................................... 51, 52, 53
*Talley v. Brentwood Union Free Sch. Dist.*,
  2009 WL 1797627 (E.D.N.Y. June 24, 2009) ...................................................34
*Taylor v. Rojas*,
  141 S. Ct. 52 (2020) ..........................................................................................3
*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) ............................................................................. 35, 36, 38
*Tolan v. Cotton*,
  572 U.S. 650 (2014) .................................................................................. 27, 28
*Torres v. City of Madera*,
  648 F.3d 1119 (9th Cir. 2011) ................................................................... 28, 37
*Ulrich v. City & County of San Francisco*,
  308 F.3d 968 (9th Cir. 2002) ............................................................ 46, 47, 48, 49
*United States v. Lanier*,
  520 U.S. 258 (1997) ........................................................................................37
*Watison v. Carter*,
  668 F.3d 1108 (9th Cir. 2012) ........................................................................50
*White v. Pauly*,
  580 U.S. 73 (2017) ..........................................................................................27
*Wood v. Ostrander*,
  879 F.2d 583 (9th Cir. 1989) ................................................................. 3, 28, 46

653883.3

7

**Constitutional Provisions**

U.S. Const. amend. I ........................................................ *passim*

**Federal Statutes**

28 U.S.C. § 1291 ............................................................4
28 U.S.C. § 1331 ............................................................4
42 U.S.C. § 1983 ...................................................... 4, 5, 25

**Federal Rules**

Fed. R. Civ. P. 12(b)(6)......................................................24
Fed. R. App. P. 4(a)(1)(A) ..................................................4

# INTRODUCTION

This appeal, the second in this case, presents one issue: could a public employer reasonably believe in 2019 that it would be lawful to fire an employee in retaliation for his husband's First Amendment-protected whistleblowing activities? Twice now, the district court has erroneously answered "yes" and dismissed Appellant Anthony DeFrancesco's claim for First Amendment retaliation on qualified immunity grounds without leave to amend. This Court already reversed that decision once; now, it must do so again.

Until his termination, DeFrancesco was a devoted employee of the University of Arizona (the "University"), where his husband also worked. When University President Robert Robbins fixed the recruitment process for a high-paying executive position to give the role to his severely underqualified friend, Michael Dake, DeFrancesco's husband spoke up against Robbins's cronyism. Robbins told Dake what happened and Dake harassed and then fired DeFrancesco in retaliation. Robbins, knowing this, did nothing to put a stop to it.

The district court previously concluded that these allegations failed to state a claim that plausibly withstood qualified immunity. The court held that, as a matter of law, (1) DeFrancesco's husband was voicing merely an "internal grievance[]" that was not protected by the First Amendment; and (2) DeFrancesco's right to be free from retaliation for his husband's speech was not "clearly established" at the

time of his termination.   (ER 45, 48.)  In violation of well-settled principles, the district court did not grant DeFrancesco a single opportunity to amend.

This Court held this was reversible error.  The Court admonished the district court that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making."  *See DeFrancesco v. Arizona Bd. of Regents*, Case No. 21-16530, 2023 WL 313209, at \*2 (9th Cir. Jan. 19, 2023) (quoting *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018)) (available at ER 34–40).

On remand, DeFrancesco filed an amended complaint with additional allegations about his husband's speech to make clear that he spoke as a private citizen on a matter of considerable public concern—Dake's lack of qualifications and the rigged process that Robbins used to hire his best friend to lead the largest public health organization in the State of Arizona.  Even the district court agreed DeFrancesco's amended complaint alleges a plausible claim of First Amendment retaliation against Robbins and Dake.  (ER 15; ER 9–10 n.2.)

However, the district court ignored the Court's instructions and doubled down on its prior, erroneous conclusion that Appellees were entitled to qualified immunity because DeFrancesco's First Amendment right was not "clearly established."  This cannot withstand review.  Even though a victim is not required to identify binding precedent with identical facts to demonstrate that a right is

clearly established, *see Taylor v. Rojas*, 141 S. Ct. 52, 53–54 (2020) (compiling cases), under similar circumstances federal courts unanimously hold that a government employee has a First Amendment right to be free from reprisals for a close family member's speech. One Circuit has expressly stated this right is clearly established. *Adkins v. Bd. of Educ. of Magoffin Cnty., Ky*., 982 F.2d 952, 956 (6th Cir. 1993). Courts *within the Ninth Circuit* agree. *E.g.*, *Freeman v. County of Riverside*, 2019 WL 7905733, at *6 (C.D. Cal. Apr. 5, 2019) (denying qualified immunity).

The decision below conflicts with controlling law on qualified immunity and, in doing so, stretches the doctrine beyond any limit of rational logic. Qualified immunity shields government officials only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal citations and quotation marks omitted). *Reasonable* is the operative standard: to be entitled to qualified immunity, an official must show that "as a reasonable officer he could have believed his actions . . . were constitutional even if they were not." *Wood v. Ostrander*, 879 F.2d 583, 591 (9th Cir. 1989).

Appellees did not act reasonably under clearly established law. The parties have been litigating this issue for several years and Appellees have not located *any* authority supporting their position—namely, holding that an individual does not

have a constitutional right to be free from retaliation for a spouse's protected speech. Appellees were not forced to make split-second decisions akin to those made during a high-speed pursuit or prison riot. No public official could have believed they could engage in a months-long retaliation campaign for First Amendment-protected speech so long as they targeted the speaker's spouse instead. Because there is no other basis on which to sustain the decision below, reversal is required.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The court dismissed with prejudice DeFrancesco's First Amendment claim under 42 U.S.C. § 1983 on August 24, 2023. DeFrancesco timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on August 30, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED

1.      Did the district court err in dismissing DeFrancesco's amended complaint on qualified immunity grounds because it was clearly established that harassing and firing DeFrancesco in retaliation for his husband's protected speech activity would violate the First Amendment?

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

DeFrancesco seeks damages pursuant to 42 U.S.C. § 1983 for a violation of his rights under the First Amendment to the U.S. Constitution.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## STATEMENT OF THE CASE

### A. DeFrancesco Alleged That Respondents Fired Him Because His Husband Spoke Out Against Their Nepotism and Corruption

The operative pleading alleges the following facts in support of DeFrancesco's claim of First Amendment retaliation in violation of 42 U.S.C. § 1983.

**1. Robbins Rigged The Recruitment For The Highest Paid Position At The University Of Arizona Health Sciences**

The University of Arizona Health Sciences ("UAHS") is an academic medical center and the largest public health organization in the State of Arizona, with an annual budget of over $1 billion and more than 500 faculty and staff. (ER 23 ¶ 19.) The Colleges of Medicine, Nursing, Pharmacy, and Public Health fall under the UAHS umbrella, in addition to dozens of research centers and clinics.

In 2017, there was a vacancy at UAHS for the head position of Senior Vice President ("SVP"). (ER 24 ¶ 24; ER 27 ¶ 42.) Robbins encouraged his "longest, best and dearest friend" to apply—Dake—and then rigged the hiring process to get him the job. (ER 25 ¶¶ 29–30.) Robbins and Dake had grown close as surgeons early in their careers, and had subsequently attended conferences, athletic events, and concerts together. (ER 25 ¶ 30.) Robbins repeatedly said that hiring Dake was like getting the "band back together again." (ER 28 ¶ 46.)

Robbins promised Dake the SVP job *before* the University's formal recruitment process even began. (ER 27–28 ¶ 43.) Robbins hid this fact by designing a hiring process he could manipulate to meet his ends. (ER 27 ¶ 41; *see also* ER 24–25 ¶¶ 24, 28.) Robbins insisted that the University retain an executive search firm that was controlled by Robbins's close personal friends. (ER 25 ¶ 28.) He also put together a sham search committee. (ER 24 ¶ 24.)

It was DeFrancesco's husband, Gregg Goldman, that discovered Robbins's scheme. At the time, Goldman was the University's Chief Financial Officer ("CFO"). (ER 24 ¶ 25.) Without knowing that Robbins intended to ensure Dake got the SVP job, Goldman served as a voluntary co-chair of the search committee. (ER 24 ¶ 26.)

Goldman's role as co-chair had nothing to do with his official job duties as CFO. (ER 24 ¶ 26.) It is hard to imagine how they could have been. He was not responsible for hiring executives at UAHS, evaluating the qualifications of such executives, or reporting ethical violations of senior University personnel. At no point did Goldman ever work with or report to Dake, or vice versa. Goldman was not even part of UAHS and was not compensated for assisting the committee. (*Id.*) The University did not require him to participate in the committee at all—let alone to serve as co-chair. (*Id.*)

Even as co-chair, Goldman's responsibilities were purely administrative. (ER 24–25 ¶ 27.) He did not organize the committee or its operations. (*Id.*) His duties did not entail interviewing or providing his own feedback about the candidates to the University. (*Id.*) Nor was he tasked with ensuring the integrity of the hiring process or evaluating whether there was improper influence by Robbins or anyone else. (*Id.*) Goldman assisted in scheduling interviews, transmitting information between the interviewers and Robbins, and little else.

7

(*Id.*)

The University received many applications for the SVP job. (ER 25 ¶ 29.) In part, this is why Robbins' maneuvering quickly became evident. Dake did poorly in his initial interview, and Goldman remarked to Robbins in a casual setting that it was unlikely he would be elevated to the next round. (ER 25 ¶ 32.) Robbins told Goldman that it was taken care of that Dake would be selected. (ER 25 ¶ 32.)

Sure enough, a straw vote revealed that the interviewers disfavored Dake and would not advance him. (ER 25–26 ¶ 33.) Some committee members, including the faculty interviewers, expressed concern that a vote against Robbins's "best and longest friend" would negatively impact their careers. (ER 26 ¶ 33.) They decided to vote anonymously to avoid such repercussions. (*Id.*)

To the shock of the interviewers, the search firm named Dake as a finalist. (ER 26 ¶ 34.) They suspected foul play but the search firm refused to disclose the actual votes. (*Id.*) When pressed, a representative of the firm admitted that the "vote had turned out how President Robbins wanted." (*Id.*)

Dake's lack of qualifications was laid bare in his follow-up interview, and the search committee concluded he was unfit for SVP. (ER 26 ¶ 36.) Dake revealed he had little or no understanding of the academic part of the job, and lacked experience in running university departments. (*Id.*) He did not grasp the

complexities of running such a large and high-profile organization like UAHS. (*Id.*) He also had a checkered employment history with allegations of unethical billing and research practices. (*Id.*) In addition, the interviewers found that he was abrasive, dismissive, impatient, overconfident, and conducted himself with a sense of entitlement. (*Id.*)

After what happened with the first vote, the committee members feared retaliation and decided to report their feedback about Dake anonymously. (ER 26 ¶ 37.) Although Robbins knew that Dake had, once again, done poorly in interviews with the search committee, Robbins declared that Dake was among the two finalists. (ER 27 ¶ 39.)

### 2. DeFrancesco's Husband Reported Robbins's Misconduct To Other University Officials

On March 2, 2018, Goldman attended an early morning meeting with Robbins and other senior officials at the University. (ER 27 ¶ 40.) In attendance were Robbins, Goldman, President Robbins's Chief of Staff Jon Dudas, General Counsel Laura Todd Johnson, Interim Provost Jeff Goldberg, and Senior Adviser to the President Brew McKenna. (*Id.*)

Robbins started the meeting by saying Dake was the only candidate that he would extend an offer to. (ER 27 ¶ 40.) Goldman spoke next. (ER 27 ¶ 41.) Goldman laid out his concerns that Robbins had entirely preplanned and contrived

9

the hiring process was entirely preplanned and contrived. (*Id*.) He explained how Robbins had improperly influenced the process so that Dake would get the job. (*Id.*) Goldman told Robbins that hiring Dake would be the worst mistake he could make and might cost Robbins his presidency. (*Id*.)

Goldman made these comments as a private citizen, not as the CFO of the University or co-chair of the search committee. (ER 27 ¶ 42.) He was acting as a whistleblower to inform all of the other senior officials that there was serious impropriety in the hiring of the SVP of UAHS—the senior-most executive tasked with running a large department at a prominent public university that has a budget of over $1 billion with a staff of over 500 public employees. (*Id.*) He was exposing corruption and abuse at the highest levels of the State's largest public university, an important issue for the community. He was speaking truth to power in the presence of the most senior officials at the University so that they and Robbins would put a stop to this corruption. (*Id.*)

After Goldman finished, President Robbins got very angry, raised his voice, and grew very animated. (ER 27–28 ¶ 43.) He admitted that he already gave Dr. Dake the job and stormed out of his office. (*Id.*) His Senior Advisor, McKenna, had known Robbins the longest and she said she had never seen him this mad. (ER 28 ¶ 44.) McKenna told Goldman that his comments "clearly hit a nerve" and that "Goldman and the others should be worried for their jobs." (*Id.*) On the walk back

to their offices, the University's General Counsel told Goldman that "she thought he did the right thing by standing up to Robbins," but she was concerned "that Goldman and herself would lose their jobs."  (ER 28 ¶ 45.)

In the end, President Robbins sabotaged the other finalist and hired Dake. (ER 28 ¶ 46.)

### 3. Dake Retaliated Against DeFrancesco After Robbins Told Him That Goldman Had Spoken Out Against His Hiring

DeFrancesco had no involvement in Dake's recruitment or Goldman's reporting.  However, he was also employed by the University as the Senior Director of Operations at UAHS.  (ER 21 ¶ 1, ER 22 ¶ 12 & n.1.)

DeFrancesco is an award-winning nutritionist and healthcare administrator, and also a University alumnus.  (ER 21 ¶ 1; ER 22–23 ¶ 13.)  Before joining UAHS, he had over 15 years of executive experience at other large health care organizations and institutions.  (ER 22 ¶ 12.)  UAHS was a dream job for DeFrancesco, and he thrived before Dake arrived.  (ER 22–23 ¶ 13; ER 23 ¶ 21.) By December 2018, after working at UAHS for three years, DeFrancesco's responsibilities had expanded to include the duties of the Associate Vice President of Finance and Administration.  (ER 23 ¶¶ 16–18.)  In this combined role, DeFrancesco was in charge of approving UAHS's billion-dollar budget and expenditures for the colleges and research centers under the UAHS umbrella.  (ER

23 ¶ 19.)  In addition, DeFrancesco served as the functional head of human resources for UAHS's 500 faculty and staff employees.  (*Id.*)  These demanding roles often required DeFrancesco to work overtime and on weekends.  (ER 23 ¶¶ 20–21.)  DeFrancesco nevertheless earned a stellar employment record and had not received a single complaint during his tenure.  (ER 23 ¶ 21.)

After hiring Dake, Robbins told him that Goldman had spoken out against his hiring and that Goldman's husband, DeFrancesco, was an executive at UAHS.  (ER 28 ¶ 47.)  Dake did not have supervisory authority over Goldman and so he could not get revenge directly.  Moreover, Goldman voluntarily left the University shortly after Dake assumed the SVP role.  (ER 28 ¶ 46.)  Dake took advantage of the fact that DeFrancesco worked underneath him to get revenge for Goldman's actions by harassing, humiliating, and ultimately firing DeFrancesco.  (ER 30 ¶¶ 57–61.)

After taking over as SVP, Dake told DeFrancesco that he was fired and had to "reapply" for his job.  (ER 28–29 ¶ 48.)  No reason was given for this action, and it came as a complete shock to DeFrancesco.  (*Id.*)  No one else at UAHS was subjected to this.  DeFrancesco later found out that he was not technically fired, and that he continued to be employed by the University.  (ER 29 ¶ 49.)  However, Dake made it clear that his goal was to force DeFrancesco out of the University.

Dake refused to promote DeFrancesco.  (ER 29 ¶¶ 51–53.)  When

DeFrancesco asked for a reason, Dake could not come up with a specific response. He vaguely stated that he needed someone who was "strategic" and a "broad" thinker. (ER 29 ¶ 54.) Dake did not elaborate or explain how he could know that DeFrancesco lacked those qualities. (*Id.*) Dake then said that since DeFrancesco's husband had left the University, DeFrancesco now had "a decision to make." (ER 29-30 ¶ 55.) The manner, directness and tone of that statement made it clear to DeFrancesco that DeFrancesco was not welcome at UAHS for as long as Dake was running the organization. (*Id.*)

When DeFrancesco refused to resign voluntarily, Dake accelerated his campaign to undermine and sabotage DeFrancesco at work. (ER 30 ¶ 57.) Put simply, Dake made DeFrancesco's life miserable. (*Id.*) In meetings with high-level executives and staff, Dake ignored DeFrancesco, such as by directing questions to others as though DeFrancesco was not in the room. (*Id.*) Dake would also circumvent DeFrancesco's authority by e-mailing and speaking with DeFrancesco's subordinates without informing DeFrancesco. (*Id.*) These efforts were designed to humiliate and embarrass DeFrancesco until he quit. (ER 30 ¶ 59.)

At one point before he left, Goldman tried to intervene on DeFrancesco's behalf by appealing to Robbins. (ER 29 ¶ 50.) Robbins claimed he would handle the problem by speaking with Dake, but the targeting and harassment did not stop.

(*Id.*)

Dake formally terminated DeFrancesco in June 2019.  (ER 30 ¶¶ 60–61.)
There is no legitimate reason for this termination.  (ER 54 ¶ 62.)  Even after
DeFrancesco received notice of his termination, Dake continued to harass
DeFrancesco.  (ER 30 ¶ 63.)  The University's policy was that a terminated
executive can work from home between the period of termination and end of
employment.  (*Id.*)  Dake refused to let DeFrancesco do so even though there was
no work-related necessity for DeFrancesco to be in the office during this time.  (ER
31 ¶ 64.)  Dake required DeFrancesco to physically come in to embarrass him in
front of his colleagues.  (*Id.*)

## B.    Procedural History

DeFrancesco sued Dake and Robbins.  He alleged that Appellees harassed
and retaliated against him because his husband, Goldman, engaged in First
Amendment-protected speech in opposing Robbins's decision to hire Dake.  (ER
63–65 ¶¶ 42–54.)

### 1.    The District Court Dismisses DeFrancesco's First Amendment Claim On Qualified Immunity Grounds And For Failure To State A Claim

Appellees filed a motion to dismiss DeFrancesco's First Amendment claim
under Rule 12(b)(6), which the court granted.  Appellees attacked DeFrancesco's
First Amendment claim on qualified immunity grounds, arguing that

DeFrancesco's right not to be retaliated against for his husband's speech was not "clearly established" at the time of the alleged retaliation. (ER 45.) In their reply brief, Appellees also argued that Goldman's speech was not protected by the First Amendment. (ER 43.) DeFrancesco objected to this new argument on reply, but the district court overruled the objection and permitted DeFrancesco to file a sur-reply. (*Id.*)

The district court ruled that qualified immunity applied. (ER 50.) The court acknowledged that the Supreme Court case *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) "is the basis for at least two circuit courts of appeal decisions which hold that a plaintiff has a cause of action for a violation of his First Amendment right to freedom of association when he suffers an adverse employment action based on the activity of his spouse." (ER 48–49 (citing *Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999) and *Adkins*, 982 F.2d at 956).) The court further acknowledged that numerous "[d]istrict courts have also found that retaliation against a public employee for the speech of a close family member violates" the First Amendment. (ER 50 (citing *Isakhanova v. Muniz*, 2016 WL 1640649, at *4 (N.D. Cal. Apr. 26, 2016) and *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1302 (M.D. Ala. 2012)).) In total, the court identified sixteen other cases that "support[ed] the proposition that a plaintiff may bring a First Amendment retaliation claim for the protected activity of his spouse." (ER 51–52.)

Nevertheless, the district court concluded that qualified immunity applied because no "*controlling* opinion . . . clearly stands for [that] proposition" or "place[s] the constitutional question . . . beyond debate."  (ER 52.)  The court characterized "Plaintiff's claim of First Amendment retaliation" as "intertwined with his right to freedom of association."  (ER 45.)  The court explained that *Roberts* "determined that the Constitution protects freedom of association in two distinct senses," one "under the Substantive Due Process Clause of the Fourteenth Amendment" and another "under the Freedom of Speech Clause of the First Amendment."  (ER 48–49.)  The court conceded that all of the cases have found a cause of action for spousal retaliation based on free speech to violate the First Amendment.  (ER 49–50.)  It nevertheless concluded that although DeFrancesco's "allegations—taken in the light most favorable to him—may constitute a violation of the Constitution, neither the Supreme Court nor the Ninth Circuit have clearly delineated the parameters of associational rights vis-à-vis a First Amendment retaliation claim."  (ER 50.)  Therefore, the court held that Appellees were entitled to qualified immunity.

The court also held that, as a matter of law, Goldman's speech was not on a matter of public concern and thus was not protected by the First Amendment.  (ER 47–48.)  Citing *Desrochers v. City of San Bernardino*, 572 F.3d 703 (9th Cir. 2009), the court characterized Goldman's statements as an "internal grievance[]"

16

that "failed to address issues in which the public would likely be truly interested." (ER 48.)  It did not permit DeFrancesco to amend.  (ER 52.)

### 2. The Ninth Circuit Reverses And Remands DeFrancesco's First Amendment Claim

DeFrancesco appealed the dismissal with prejudice of his First Amendment claim.  The Ninth Circuit reversed.  (ER 34–40.)  The Court explained that although speech about poor interview performance and bad hiring decisions "can be construed to implicate only workplace grievances or a 'personality dispute'" (ER 38 (quoting *Desrochers*, 572 F.3d at 712)), "[a]llegations of government misconduct—including the rigging of the executive search process and the mismanagement of a hospital—can constitute protected speech as a matter of public concern" (ER 38–39).  The Ninth Circuit also held that the "facts DeFrancesco pleads support an inference that he was terminated *because* he is married to a person who spoke out against the Defendants' actions."  (ER 38 (emphasis added).)  For this reason, the court remanded with instructions to grant DeFrancesco leave to amend so that he could "allege facts demonstrating that Goldman spoke as a whistleblower on cronyism and corruption at UAHS."  (*Id.*)

The Court urged the district court on remand to be cautious before applying qualified immunity again on the pleadings.  (ER 39–40.)  It noted that determining "'claims of qualified immunity at the motion-to-dismiss stage raises special

problems for legal decision making.'"  (ER 39 (quoting *Keates*, 883 F.3d at 1234).)

The Ninth Circuit instructed that, "[i]f the operative complaint contains even one

allegation of a harmful act that would constitute a violation of a clearly established

constitutional right, then [DeFrancesco is] entitled to go forward with [his] claim."

(ER 39–40 (citation and internal quotation marks omitted).)

### 3. The District Court Again Dismisses The First Amendment Claim On Qualified Immunity Grounds

DeFrancesco heeded the Ninth Circuit's advice.  He amended his allegations

to make clear that Defendants retaliated against him based on First Amendment-

protected speech by Goldman.  The allegations in the Second Amended Complaint

("SAC"),[1] as detailed above, make clear that Goldman did not just speak about

poor interview performance or bad hiring decisions.  He spoke out against

cronyism and corruption in a large public university.

For example, the SAC supplemented his earlier allegations by explaining

how Robbins rigged the process to conceal the fact that Robbins encouraged his

---

[1] DeFrancesco's original complaint also alleged a Title VII claim of sexual orientation discrimination that is not at issue in this appeal.  (ER 68–69 ¶¶ 78–85.) After dismissing that claim, the district court permitted DeFrancesco to file a First Amended Complaint on the Title VII claim only.  (ER 41.)  The district court subsequently dismissed that claim with prejudice, which was affirmed during the first appeal.  (ER 35–36.)  On remand, DeFrancesco filed a Second Amended Complaint restating only his First Amendment claim.  (ER 20–33.)

best friend, Dake, to apply and then promised him the job.  (ER 25 ¶¶ 29–30; ER

27–28 ¶ 43.)  Among other things, he requested that the University retain a search

firm who would allow Robbins to rig the process through vote manipulation.  (ER

25 ¶ 28; ER 25–26 ¶¶ 33–34.)  That search firm later admitted that Robbins

intervened on Dake's behalf, and that this is what Goldman blew the whistle on.

(ER 26 ¶ 34.)  The SAC also adds further details on Goldman's reporting and how

it was not part of his job duties.  (ER 24–25 ¶¶ 26–27; ER 25–26 ¶¶ 32–38; ER 27–

28 ¶¶ 40–45.)

     The district court agreed with DeFrancesco that these amended allegations

stated a viable First Amendment claim that Appellees "harassed and retaliated

against him 'because his husband[, Goldman,] exercised his First Amendment-

protected right of free speech by opposing President Robbins' decision to hire

Dake as Senior Vice President of UAHS."  (ER 6.)  The district court switched

course from its first decision and held that "the SAC alleges facts raising an

inference that Goldman spoke on a matter of public concern and spoke outside the

scope and content of his job responsibilities" and was thus "protected [speech]

under the First Amendment."  (ER 10 n.2; ER 15.)  The court paid no heed to

Appellees' ancillary argument that there were no cognizable allegations of

wrongdoing by Robbins.

     However, once again, the district court granted Appellees' motion to

dismiss. Specifically, the court "decide[d] th[e] case based on qualified immunity," and "decide[d] the question of qualified immunity on the narrow determination of whether allegations in the SAC support a claim that the Defendants violated a clearly established constitutional right." (ER 9; ER 12.)

The court first acknowledged that "[t]he First Amendment shields public employees from retaliation for their protected speech." (ER 9.) The court also recognized that multiple cases—including Circuit cases—have denied qualified immunity after finding it well settled that

> the First Amendment may . . . be violated where the speech that invoked the government's retaliatory response was not made by the plaintiff [], but rather by a person in a close relationship with the plaintiff, and the government retaliated against the plaintiff for [his] perceived association with the other person and that person's speech.

(ER 9-10 (quoting *Freeman*, 2019 WL 7905733, at *6 and citing in parenthetical *Lewis*, 922 F. Supp. 2d at 1302); ER 16 (citing *Adler*, *Adkins*, and *Sowards v. Loudon County*, 203 F.3d 426 (6th Cir. 2000)).)

Nevertheless, the court held that "no persuasive law . . . clearly establishes that a First Amendment retaliation claim may be made by one person for the protected speech of another person based on a close personal relationship between the two." (ER 19.) Ironically, the court faulted DeFrancesco for not citing any Ninth Circuit precedent on all fours while primarily relying on Eleventh Circuit

law.

In particular, the court imposed a limitation that the only "prior case law" capable of clearly establishing a constitutional rule is that of "the Supreme Court of the United States, the Ninth Circuit, or the highest court in the relevant state[] that is 'materially similar.'" (ER 16 (quoting *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017)).) In fact, the court borrowed its analysis almost entirely from *Gaines v. Wardynski*, which applied qualified immunity where the plaintiff had alleged her First Amendment rights were violated when she was passed over for a promotion because of her father's statements about a matter of public concern. (ER 17 (citing *Gaines*, 871 F.3d at 1209).) The Eleventh Circuit found the allegations stated a First Amendment violation but that the plaintiff's right was not clearly established in 2013, when she lost the promotion. 871 F.3d at 1208–09. But the *Gaines* court held that the plaintiff's right could not have been clearly established because there was no controlling U.S. Supreme Court, Eleventh Circuit, or state court decision at the time of the challenged conduct— notwithstanding the numerous decisions from other circuit and district courts establishing such a right. *Id.* at 1209.

For the same reason, the district court in this case rejected that any decisions from lower courts within the Ninth Circuit "clearly established" DeFrancesco's First Amendment right. (ER 16–18.) It refused to consider them relevant even

though in one, *Freeman v. County of Riverside*, the Central District of California denied qualified immunity on a First Amendment claim based on familial retaliation.  (ER 16–17.)

The court also declared the out-of-Circuit cases "distinguishable because they are based on the First Amendment right of association, not free speech."  (ER 16 (citing *Adler*, *Adkins*, and *Sowards*).)  The court did not grapple with the allegations of retaliation in those cases, but instead relied on its prior motion-to-dismiss ruling—the one the Ninth Circuit reversed—where it held that the right of association under the First Amendment was "not clearly established."  (ER 8.)  The decision does not even mention other Circuit cases cited by DeFrancesco, such as *Nailon v. University of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017), which expressly held that close relatives of a person engaged in protected speech have a clearly established First Amendment right to be free from retaliation for that speech.  *Id.* at 510, 516–17.

After ticking off faults with all of the cases that supported DeFrancesco's claim, the court declared that "the SAC does not contain even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right" and dismissed with prejudice his First Amendment claim.  (ER 19.)

# SUMMARY OF ARGUMENT

The district court order must, again, be reversed. The Constitution does not permit government officials to chill the exercise of free speech by firing public employees in retaliation for protected whistleblowing activity. Yet that is exactly what Dake did when he terminated DeFrancesco because his husband—another University employee—stood up against Robinson's nepotism in hiring Dake. Even after this Court cautioned against "[d]etermining claims of qualified immunity at the motion-to-dismiss stage," the district court concluded that Respondents were immune from liability as a matter of law. (ER 39.) Not because their conduct was constitutional, and not because the unconstitutionality of retaliating against an employee who engages in protected speech is not "clearly established," but because the court believed the "unlawfulness" of retaliating against *a family member* "in response to protected speech" would not have been sufficiently "apparent" in 2019 to a reasonable official in Appellees' shoes. (ER 15.)

This Court must reverse. The district court applied the wrong standard to analyze whether DeFrancesco's First Amendment right was "clearly established" for purposes of qualified immunity. The court erroneously required DeFrancesco to cite controlling precedent from the Supreme Court or this Court, and it disregarded on-point cases from across the country that agreed the First Amendment protects a state employee from retaliation based on the protected

speech of his spouse. At this early stage, this robust and unanimous authority is sufficient to overcome Appellees' qualified immunity defense.

The other arguments from Appellees' motion to dismiss—that the speech at issue was not constitutionally protected or the SAC failed to state a claim against President Robbins—lack merit. They did not persuade the district court and offer no alternative basis on which to affirm the decision below.

## STANDARD OF REVIEW

This Court reviews *de novo* orders granting a Rule 12(b)(6) motion to dismiss, including on qualified immunity grounds. *Keates*, 883 F.3d at 1234. *De novo* review means, like the district court, the Court must view the claims "in the light most favorable" to DeFrancesco, "accepting all well-pleaded factual allegations as true, as well as any reasonable inferences drawn from them." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008). His claim must only be "plausible" to survive dismissal, which "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting them. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The decision below must be reversed unless DeFrancesco alleged no facts that, if true, would entitle him to relief. Fed. R. Civ. P. 12(b)(6); *Twombly*, 550 U.S. at 555.

**ARGUMENT**

## I.  THE DISTRICT COURT ERRED IN GRANTING APPELLEES QUALIFIED IMMUNITY FOR FIRING DEFRANCESCO IN RETALIATION FOR HIS HUSBAND'S PROTECTED SPEECH

Qualified immunity provides defendants sued under 42 U.S.C. § 1983 a defense when the alleged constitutional violation was not "clearly established" at the time the defendants engaged in wrongdoing.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The decision below misapplied the law regarding when a right is "clearly established" for qualified immunity purposes.  The standard, stated correctly, confirms that the district court committed two errors in granting qualified immunity to Appellees on the grounds that DeFrancesco's right to be free from retaliation was not clearly established when they retaliated against him because of his husband's protected speech:

*First*, the court improperly discounted the robust consensus of on-point First Amendment cases clearly establishing that firing DeFrancesco for his husband's speech would violate his First Amendment right.  The district court erroneously allowed Eleventh Circuit case law to displace the mandates of the Supreme Court and this Circuit by crediting (1) only "prior case law from the Supreme Court of the United States, the Ninth Circuit, or the highest court in the relevant state[]" that (2) it deemed "materially similar" to the case at hand.  (ER 16.)  As explained below, the Supreme Court has *rejected* this as too "rigid [a] gloss on the qualified

immunity standard" that is "not consistent" with the law. *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002).

*Second*, the court disregarded this Court's reminder that qualified immunity is rarely resolved on a motion to dismiss. To the extent the court hemmed and hawed over which constitutional provision Appellees violated, the district court should have resolved the competing inferences in DeFrancesco's favor and denied the motion to dismiss.

### A. The District Court Required Binding Precedent But Qualified Immunity Must Be Denied So Long As Defendants Had Fair Notice Their Conduct Was Unconstitutional

In its order, the district court described the qualified immunity inquiry as turning on "'whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case.'" (ER 15 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)).) The court went on to say that, unless existing "case law, in factual terms, has . . . staked out a bright line, qualified immunity almost always protects the defendant." (ER 15 (quoting *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)).) It held Appellees were entitled to qualified immunity unless DeFrancesco "point[ed] to prior case law from the Supreme Court of the United States, the Ninth Circuit, or the highest court in the relevant state[] that is 'materially similar.'" (ER 16 (citing *Gaines*, 871 F.3d at 1210).)

Twenty years ago, the Supreme Court explicitly rejected the district court's "materially similar" requirement—lifted from Eleventh Circuit case law—as well as the notion that the absence of a reported case on point justifies qualified immunity. *Hope*, 536 U.S. at 741. Contrary to the district court's decision, a right can be "clearly established" without binding precedent on all fours. *See Hope*, 536 U.S. at 741 (qualified immunity does not require "the very action in question" to have "previously been held unlawful"); *White v. Pauly*, 580 U.S. 73, 79 (2017) (doctrine "does not require a case directly on point"); *Lum v. Jensen*, 876 F.2d 1385, 1387 (9th Cir. 1989) ("A right can be clearly established even though there was no binding precedent in this circuit.").

All that matters is that the "contours" of the right were "sufficiently clear that a reasonable official would understand that what he [did] violates that right." *Hope*, 536 U.S. at 739. This requires only that the state of law at the time gave "fair warning" or "fair notice" that the challenged conduct was unlawful. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018); *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Hope*, 536 U.S. at 739). Not every case demands "a very high degree of prior factual particularity" to deny qualified immunity. *Hope*, 536 U.S. at 741. In many cases, "a general constitutional rule already identified in the decisional law" will "apply with obvious clarity to the specific conduct in question." *Id.* Even just "[t]he reasoning" of an earlier case may be enough to

27

confer "fair warning . . . of what is constitutionally permissible." *Hope*, 536 U.S. at 743.

Moreover, *any* decisional law can provide fair warning/notice, "including relevant decisions of other circuits, state courts, and district courts." *Moonin v. Tice*, 868 F.3d 853, 868 (9th Cir. 2017); *see also Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (in addition to "Ninth Circuit or Supreme Court caselaw on point" courts "look to the decisions of our sister Circuits, district courts, and state courts"); *Wood*, 879 F.2d at 591 ("The available decisional law includes cases from state courts, other circuits and district courts."). The combination of two existing precedents, *Polanco v. Diaz*, 76 F.4th 918, 930 (9th Cir. 2023), or even "a robust 'consensus of cases of persuasive authority'" can place a right adequately beyond debate, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011).

The reasonableness of the officers' conduct is the lynchpin of the analysis. Qualified immunity protects officials from *reasonable* mistakes in *borderline* cases, *Saucier*, 533 U.S. at 206; it does *not* shield officials from unreasonable mistakes of law or fact, *Torres v. City of Madera*, 648 F.3d 1119, 1127–30 (9th Cir. 2011).

In evaluating reasonableness, the court must consider the facts in the light most favorable to the plaintiff. *Tolan*, 572 U.S. at 655–56; *see also Hydrick v. Hunter*, 500 F.3d 978, 986 n.5 (9th Cir. 2007), vacated on other grounds, 556 U.S.

1256 (2009) (the court may not "evaluate the veracity of the [p]laintiffs'

allegations, or . . . speculate as to the [d]efendants' justifications for their actions").

For this reason, motions to dismiss are a poor vehicle to resolve a qualified

immunity defense. *Keates*, 883 F.3d at 1234–35.

> **B.     By 2019, A Robust Consensus Of Cases Held That The First
>           Amendment Prohibits Retaliation Against A Government
>           Employee For His Family Member's Speech**

Although the district court paid lip service to some of these principles in its

order, it did not meaningfully apply them in concluding that Appellees reasonably

believed in 2019 that they could fire DeFrancesco in retaliation for First

Amendment-protected speech.

DeFrancesco's right not to be fired from his University job because of his

husband's free speech follows from clearly established First Amendment

jurisprudence and has been confirmed numerous times in the specific context of

familial retaliation claims. The district court's reasons for distinguishing this

precedent strain credulity and cannot be squared with the Supreme Court and

Circuit law on qualified immunity.

> **1.     It Is A Matter Of First Principles That The Government
>           Cannot Retaliate For Free Speech.**

"[T]he law is settled that as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions . . . for

speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford–El v. Britton*, 523 U.S. 574, 592 (1998), and *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *accord Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). Fifty years ago, the Supreme Court declared it settled law that the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597. Accumulating cases, the Court noted that "most often, we have applied [this] principle to denials of public employment." *Id.*

Indeed, a government employee's "First Amendment right to be free from retaliation for . . . protected speech" has been expressly "clearly established" in the Ninth Circuit for decades. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1065 (9th Cir. 2013) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 571 (1968)); *accord Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009); *DiRuzza v. County of Tehama*, 206 F.3d 1304, 1306 (9th Cir. 2000).

> **2.    For Over Twenty Years, Courts Have Applied Those First Principles To Plaintiffs That Were Retaliated Against For Their Family Members' Protected Speech**

Neither the Supreme Court nor the Ninth Circuit have held that, to state a First Amendment claim, the plaintiff must be both the speaker and the victim of the retaliation. Although the "prototypical plaintiff" in a First Amendment retaliation case is "a government worker who loses his job as a result of some public

communication critical of the government entity for whom he works," *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 544 (9th Cir. 2010) (citing *Pickering*, 391 U.S. at 564), by 2019 multiple federal courts had held there is a First Amendment right to be free from retaliation based on the protected speech of the plaintiff's spouse or other close family member. Of course they had: this rule is compelled by longstanding Supreme Court precedent. The Supreme Court recognized forty years ago that the First Amendment safeguards familial relationships from such "undue intrusion by the State." *Roberts*, 486 U.S. at 617–18. The Supreme Court has "reaffirmed" this time and again. *Adkins*, 982 F.2d at 956 (citing *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987)). For good reason: the First Amendment's "'profound national commitment to . . . debate on public issues' . . . would be severely frustrated if the First Amendment did not include within its protective ambit an employee who bears such a close relationship with a person who engages in protected speech." *Lewis*, 922 F. Supp. 2d at 1302–03 (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)).

Citing *Roberts* and its progeny, multiple Circuit courts expressly have held that individuals have a right under the First Amendment to be free from retaliation for the protected speech of their close family members. For example, in 1999 the Second Circuit determined that the plaintiff had sufficiently stated a claim of First Amendment retaliation based on his contention that he was fired because his wife

31

brought a lawsuit against state officials.  *Adler*, 185 F.3d at 45.  The court reasoned that "[w]herever the line might be drawn that separates a state's permissible and impermissible actions against an employee based on a spouse's conduct, [a] discharge because of [the plaintiff's] wife's lawsuit is well across the line."  *Id.* at 44.  It concluded: "if simple vindictiveness against the plaintiff on account of his wife's lawsuit was the defendants' true motive, a First Amendment violation would be established."  *Id.* at 45.

On at least four occasions, the Sixth Circuit has similarly affirmed the existence of a First Amendment right based on familial retaliation.  *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017) (public university employee stated First Amendment claim based on termination allegedly in retaliation for her niece's racial discrimination complaints); *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 417 (6th Cir. 2011) (married state employees suffered adverse employment actions following publication of newspaper article about nepotism regarding husband-and-wife employees); *Sowards*, 203 F.3d at 432 (employee of state jail had First Amendment right to be free from retaliation for supporting her husband's political campaign); *Adkins*, 982 F.2d at 955–56 (same for high school secretary who alleged that the superintendent of the school board refused to rehire her in retaliation for her association with her husband, who was the principal of the high school).  And it has held that this right is clearly established.  *Nailon*, 715 F. App'x

at 515 (denying qualified immunity); *Sowards*, 203 F.3d at 439 (same).

Courts within this Circuit have affirmed there is also a First Amendment right to be free from retaliation for a close family member's free speech.  In *Isakhanova v. Muniz*, the district court denied a motion to dismiss a First Amendment retaliation claim alleging that the plaintiff was detained, searched, and denied visitation with her incarcerated son after he signed prison grievances.  The court found unequivocally that "alleged retaliation against one 'associated party' for the speech of another . . . falls squarely within the First Amendment protections," and "Defendants . . . cited no case law that forecloses relief for such harm in the Ninth Circuit, under the First Amendment or otherwise."  2016 WL 1640649, at \*4.

Similarly, in *Freeman v. County of Riverside*, the court denied qualified immunity to officials within a County sheriff's department who allegedly disciplined an employee in response to online posts by her husband that criticized the department.  2019 WL 7905733, at \*5.  The *Freeman* court cited multiple cases that already "recognize[d] a cause of action where an individual has suffered retaliation for his or her perceived association with the speech of a close family member" and noted that this right is clearly "protected by the First Amendment."  *Id.* at \*5 & n.2.

The only time a similar issue was before this Court, it agreed that family

members have the right to bring an independent First Amendment claim in their own name. *See Biggs v. Best, Best & Krieger*, 189 F.3d 989, 998–99 (9th Cir. 1999). In *Biggs*, the husband and daughter of a lawyer who was fired allegedly in retaliation for their political advocacy sued the law firm. The Ninth Circuit agreed that the family members had the right to bring a First Amendment claim that was coextensive with the fired lawyer's. *See Biggs*, 189 F.3d at 998–99.[2]

Other cases abound.[3] Indeed, when confronted with a similar issue in the

---

[2] The Ninth Circuit ultimately upheld the application of qualified immunity at summary judgment, but on the grounds that the lawyer was a "policymaker[ ] subject to patronage discharge." *Biggs*, 189 F.3d at 995. This narrow "policymaker" exception is a unique defense to a First Amendment claim based on political affiliation and is not applicable to this case. Nevertheless, solely on this basis, the district court held that *Biggs* "does not help" DeFrancesco. (ER 18.) The court also used this as grounds to distinguish *Freeman* because it cited to *Biggs*, but cited nothing to such nesting-doll logic. (ER 17–18.)

[3] *Agostino v. Simpson*, 2008 WL 4906140, at *5 (S.D.N.Y. Nov. 17, 2008) (upholding claim "alleging that Defendants took adverse action against Plaintiff in retaliation for [his father's] First Amendment activities"); *Fannon v. Patterson*, 2014 WL 4273337, at *4 (S.D. Ohio Aug. 29, 2014) (recognizing that plaintiff asserted a potentially viable claim for First Amendment retaliation based on the protected speech of his parents); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 134–35 (D. Conn. 2010) (denying summary judgment; holding that plaintiff presented sufficient evidence that he was retaliated against because of the First Amendment-protected speech of his spouse); *Talley v. Brentwood Union Free Sch. Dist.*, 2009 WL 1797627, at *6 (E.D.N.Y. June 24, 2009) (denying motion to dismiss retaliation claim brought by a daughter for her father's conduct); *Roberts v. Ferry County*, 2008 WL 5121606, at *5 (E.D. Wash. Dec. 5, 2008) (adopting Second Circuit's holding in *Adler* that claims involving adverse action "taken solely against one spouse in retaliation for the other spouse's conduct" are violations of the First Amendment); *Gray v. Bruneau-Grand View Sch. Dist. No. 365*, 2007 WL

context of Title VII, the U.S. Supreme Court had "little difficulty concluding" that firing someone in retaliation for a spouse's protected activity is unlawful.

*Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011). The Court explained that it was "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Id.* at 174. The Court extended this rule to "firing [any] close family member" of the person engaged in protected activity. *Id.* at 175.

### 3. The District Court Contravened Supreme Court And Ninth Circuit Law In Holding Existing Law Was Insufficient To Clearly Establish That Firing DeFrancesco Was Unconstitutional

It is impossible to reconcile this bevy of law with the district court's conclusion that Appellees lacked fair warning that firing DeFrancesco would violate his First Amendment rights.

---

1381785, at *1 & n.2 (D. Idaho Mar. 27, 2007) (plaintiff's "association with her husband is an intimate association entitled to protection under the First Amendment" such that plaintiff's husband's "criticizing [plaintiff's employer's] officials and their policies" "could not reasonably be found to justify" adverse employment action against her (citation omitted)); *Cain v. Tigard–Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120, 1127 (D. Or. 2003) (upholding claim based on defendant's retaliatory conduct towards child for parents' speech); *Serena H. v. Kovarie*, 209 F. Supp. 2d 453, 458 (E.D. Pa. 2002) (denying motion to dismiss First Amendment claim that plaintiff "was retaliated against based upon her mother's exercise of free speech").

### (a) It Is Obvious From The General Principle That The First Amendment Prohibits Speech-Based Retaliation That Spousal Retaliation Is Prohibited Too

The district court first accused DeFrancesco of "mistakenly defin[ing] clearly established law at a high level of generality." (ER 15.) The court stated, "It is not enough to show that it is clearly established that the First Amendment prohibits retaliation against an employee who engages in protected speech." (*Id.*; *see also* ER 17 ("reject[ing] [DeFrancesco's] reliance on the broader, clearly established First Amendment principles that apply generally to preclude retaliatory conduct against a person who has exercised his right to speak"). Wrong.

By the time Appellees terminated DeFrancesco in 2019, the existing law prohibiting speech-based retaliation was sufficiently established that "a more particularized expression of the law" was not "necessary" for Appellees to understand retaliating against a spouse is also unlawful. *See supra* Part I.B.1; *see also Mendoza v. Block*, 27 F.3d 1357, 1361–62 (9th Cir. 1994) (holding officers should have been aware that use of a dog during arrest could violate Fourth Amendment in light of existing principles on when force is excessive); *Schwenk v. Hartford*, 204 F.3d 1187, 1198 (9th Cir. 2000) ("Where the law has provided the defendant with . . . fair warning, 'closely analogous pre-existing case law is not required to show that the law is clearly established.'" (citation omitted)).

If there was ever a situation where "a general constitutional rule already

identified in the decisional law . . . appl[ies] with obvious clarity to the specific conduct in question," it is this case. *Hope*, 536 U.S. at 741; *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) ("[E]ven if there is no closely analogous case law, a right can be clearly established on the basis of 'common sense.'"). It is telling that the district court never explained how the "general[]" principle that the First Amendment shields public employees from employment retaliation for protected speech would not have conferred "fair warning" to Appellees that their conduct towards DeFrancesco was impermissible. For example, no earlier retaliation case "expressly le[ft] open" whether spousal retaliation is also unconstitutional. *See Hope*, 536 U.S. at 741 ("a very high degree of prior factual particularity" may be necessary where "an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue") (quoting *United States v. Lanier*, 520 U.S. 258, 270–71 (1997)). And Appellees never argued that it was unclear under existing law that *firing* DeFrancesco—opposed to some lesser form of punishment—would constitute retaliation. That too is settled. *See infra*, Part II.A.

The only difference here is that DeFrancesco was the husband of the person engaged in protected speech. That does not transform this case into a scenario where Appellees were forced to grope for the "outer contours" of a constitutional right without the benefit of a factually similar case. *Torres*, 648 F.3d at 1128.

The Supreme Court has already implicitly agreed.  *See Thompson*, 562 U.S. at 174 (it is "obvious" that retaliation against a fiancé "for engaging in protected conduct" is unlawful).[4]  Indeed, the Supreme Court's "reasoning" for finding spousal retaliation violates Title VII "has clear applicability in this case," which is enough to clearly establish its unlawfulness for First Amendment purposes.  *See Hope*, 536 U.S. at 743.

> **(b)**  **The Factually Analogous Out-Of-Circuit And District Court Cases Place The Unlawfulness Of Spousal Retaliation Beyond Debate**

In any event, by 2019 numerous Circuit and district court cases had expressly held the First Amendment equally prohibits retaliation that is directed at a spouse or similarly close family member of an individual engaged in free speech. Although "a very high degree of prior factual particularity" in existing law is not mandatory to clearly establish a right, *Hope*, 536 U.S. at 740, in this case there is

---

[4] The district court dismissed *Thompson* because the Eleventh Circuit did in *Gaines*.  (ER 17 (citing *Gaines*, 871 F.3d at 1210 [because "*Thompson* is not a First Amendment case . . . [it] does not constitute clearly established First Amendment law"]).)  Unlike the Eleventh Circuit, the Ninth Circuit looks to Title VII cases in construing First Amendment retaliation claims, including when a right is "clearly established" for qualified immunity purposes.  *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003); *cf. Bator v. State of Hawai'i*, 39 F.3d 1021, 1028 n.7 (9th Cir. 1994) ("Title VII cases are relevant to the discussion of when [a] constitutional right . . . became clearly established because Title VII . . . reflects our collective understanding of what conduct violates a person's rights.").

prior case law on all fours. This is "especially strong support for [the] conclusion that the law is clearly established." *Id.* at 741.

The decision below emphasizes purported factual differences between those cases and this one—such as the application of the "policymaker" exception in *Biggs*. (ER 18.) However, the differences cited are not material. The decision is silent on how they could have suggested to a reasonable officer in Appellees' shoes that their conduct towards DeFrancesco was permissible. *See Hope*, 536 U.S. at 739 ("pre-existing law" must only make "unlawfulness . . . apparent"); *Lanier*, 520 U.S. at 270–71 (even "notable factual distinctions" do not trigger automatic immunity where "[g]eneral statements of the law" in earlier cases gave "fair and clear warning" of the constitutional right).

The court also put misplaced weight on cautionary language from the Ninth Circuit about relying on district court decisions. (ER 12-13 (citing *Evans v. Skolnik*, 997 F.3d 1060 (9th Cir. 2021), *S.B. v. County of San Diego*, 864 F.3d 1010 (9th Cir. 2017), *Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012), and *DePaul Indus. v. Miller*, 14 F.4th 1021 (9th Cir. 2021)).) Its "hesitan[cy] to rely on district court decisions" because they "do not necessarily settle constitutional standards" is irrelevant here. *See Evans*, 997 F.3d at 1067 (cited ER 12). The constitutional standards are—and have long been—settled.

As the Sixth Circuit put it in 2017, "it should have been clear to a reasonable

University official that retaliating against [the plaintiff] for [a family member's] speech would be unlawful. The Defendants are therefore not entitled to qualified immunity." *Nailon*, 715 F. App'x at 517; *see also Isakhanova*, 2016 WL 1640649, at *4 ("[A]lleged retaliation against one 'associated party' for the speech of another . . . falls squarely within the First Amendment protections.").

In support of the notion that district court cases cannot clearly establish law, the court also cherry-picked inapposite ones. For example, it cited *S.B. v. County of San Diego* as "rejecting the argument that one published and one unpublished district court decision, both factually distinguishable, constituted clearly established law." (ER 13.) Both *Marsh* and *DePaul Industries* (cited ER 13) likewise held that two non-precedential decisions did not clearly establish the plaintiffs' rights in question. In *DePaul Industries*, neither of the earlier cases involved the state statute that was the source of the plaintiff's alleged right. *See DePaul Indus.*, 14 F.4th at 1028–29 ("Neither case even mentions the [Oregon] statute. So, even if the cases were binding precedent, neither is sufficient to 'place[] the statutory or constitutional question' about whether the [Oregon] statute created a protected property interest 'beyond debate.'"). The body of law that has declared that relatives have a clearly established right to be free from speech-based retaliation is significantly more robust. The district court should have credited it in analyzing whether Appellees had fair warning that terminating DeFrancesco was

unconstitutional.

The district court also should have considered the nature of the right at issue before dismissing all district court case law as not "persuasive." *Evans* and *S.B.* stressed the need for closely analogous precedent, but they were dealing with when a *Fourth Amendment* violation is clearly established. *Marsh* and *DePaul Industries* similarly addressed due process claims under the fuzzy standards of the Fourteenth Amendment. This Court has explained that factual similarity is "especially" important in those contexts because "[t]here are countless confrontations involving officers that yield endless permutations of outcomes and responses." *Sharp v. County of Orange*, 871 F.3d 901, 912 (9th Cir. 2017).

In contrast, not only *is* there a close factual similarity between this case and prior First Amendment law on spousal retaliation, but this case does not involve a constitutional standard that governs "officers [who] encounter suspects every day in never-before-seen ways." *See id*. This is a case of premeditated, prolonged employment discrimination. It strains credulity that Appellees needed the Supreme Court or the Ninth Circuit to explicitly tell them this was wrong. *See Mendoza*, 27 F.3d at 1361 (qualified immunity only protects those who "could not reasonably have known how to pattern their conduct so as to avoid liability").

41

**(c)** **Protecting Appellees For Their Intentional Retaliation Would Not Serve The Purposes Of Qualified Immunity**

The district court's reliance on the absence of binding precedent to grant qualified immunity to Appellees is wrong for another reason: it is anathema to the point of qualified immunity.

Immunity serves to "protect officials who are required to exercise their discretion" by allowing them to take action "with independence and without fear of consequences." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 819 (1982). Accepting DeFrancesco's allegations as true, there is no societal interest in allowing the government to fire an employee in retaliation for free speech "with independence" or "without fear of consequences." *See id.* (citation omitted). By equating the requirement that "clearly established right[s] be defined with specificity" with a rule that only "prior case law from the Supreme Court" or "the Ninth Circuit" that is "materially similar" can clearly establish a right (ER 13, 16), the court turned the doctrine of qualified immunity into absolute immunity. This cannot be affirmed.

**C.** **This Is Not The Rare Case Where Qualified Immunity Should Have Been Decided On A Motion To Dismiss**

This Court has repeatedly advised of the need to exercise caution when a defendant raises a qualified immunity defense in a Rule 12(b)(6) motion, which puts courts in "the difficult position of deciding 'far-reaching constitutional

questions on a non-existent factual record.'" *Hydrick*, 500 F.3d at 985 (citation omitted). "'[D]ismissal is not appropriate unless [the Court] can determine, based on the complaint itself, that qualified immunity applies.'" *Polanco*, 76 F.4th at 925 (quoting *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) and *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)).

Taking DeFrancesco's allegations as true, Appellees knowingly fired him to punish him for his husband's protected speech. In dismissing all the law that supports his claim as not "persuasive" (ER 19), the court did not construe DeFrancesco's allegations in the light most favorable to him, as required.

The decision below is devoid of meaningful analysis of *Adler*, *Adkins*, and the other Circuit cases that affirmed that the First Amendment also prohibits retaliation because of protected speech that is directed at the spouse of the person engaged in protected speech activity. The court did not find that these cases were factually dissimilar because of the nature of the speech or retaliation at issue. To the contrary, the court noted that all involved termination (or the "refus[al] to recommend [the plaintiff's] continued employment") in retaliation for the plaintiffs' spouses' conduct. (ER 16.) Instead, the court declared *ipse dixit* that the out-of-circuit decisions could not have conveyed fair notice to Appellees because they dealt with the First Amendment "right of association," not retaliation. (*Id.*)

As an initial matter, the district court is simply wrong that those cases did

not involve retaliation claims. *See, e.g.*, *Adler*, 185 F.3d at 40 ("Plaintiff's Retaliation Claim"); *Sowards*, 203 F.3d at 431 ("Sowards's First Amendment Retaliation Claim").

Moreover, even if the earliest cases (*Adler*, *Adkins*) had to grapple with ambiguity in the constitutional source of the right at issue, those cases predate DeFrancesco's termination by two decades. For example, in considering whether the plaintiff had alleged a clearly established First Amendment right in 1999, the *Adler* court noted that "the appropriate constitutional framework within which to analyze [the plaintiff's] claim" was "not free from doubt." *Adler*, 185 F.3d at 42–44. However, the Second Circuit did not examine whether the plaintiff's firing had impaired his relationship with his wife—the sine qua non of a violation of a constitutional right to "associate." Rather, it reasoned that claims involving "retaliatory action" are brought under "the First Amendment whenever adverse action is alleged to have been taken for exercise of any of the freedoms protected by the First Amendment." *Id.* at 43 (citing *Perry*, 408 U.S. at 598). That is the framework the court applied: "a retaliatory discharge based solely on litigation instituted by one's spouse is actionable under the First Amendment." *Id.* at 45. But by 2019, as explained above, the law *was* clear.

In any event, to the extent some courts have applied the First Amendment "right of association" to third-party reprisals, the court erred in concluding this

justified qualified immunity on the pleadings. Qualified immunity does not give an officer who engages in conduct that was unconstitutional when committed a get-out-of-liability-free card because there is "some lingering ambiguity" as to which constitutional provision "applies in this precise context," or whether the defendant has managed to violate several constitutional provisions at once. *See, e.g.*, *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) ("[E]ven if it were unclear whether the Fourth or Fourteenth Amendment governs Harris's excessive force claims, the legal norms underlying those claims were nevertheless clearly established."); *Estate of Booker v. Gomez*, 745 F.3d 405, 428 (10th Cir. 2014) (same); *Miranda–Rivera v. Toledo–Davila*, 813 F.3d 64, 72–73 (1st Cir. 2016) (same); *see also P.B. v. Koch*, 96 F.3d 1298, 1303 n.4 (9th Cir. 1996) ("Regardless of the appropriate [constitutional] 'home' for plaintiffs' right to be free from excessive force, there was a clearly established right to be free from such force in 1990 and 1991. That there is possible uncertainty as to the appropriate test does not immunize Koch's actions from liability.").

To the extent DeFrancesco may have "associational" rights under the First Amendment in addition to his right to be free from speech-based retaliation, that doubles Appellees' liability, not eliminates it entirely. *Keates*, 883 F.3d at 1236 ("[W]e have held that claims under both the First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a

motion to dismiss."); *cf. Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (harming relationship between immediate family members "sufficiently alleged violations of the First and Fourteenth Amendments"). The district court's reliance on technical labels is exactly the kind of "lawyerly distinction[] that def[ies] common sense" that this Court has held "should not be . . . allow[ed] . . . to distinguish away clearly established law." *Wood*, 879 F.2d at 593.

This Court's prior direction was clear: so long as "the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then [DeFrancesco is] entitled to go forward with [his] claim." (ER 39–40 (citation and internal quotation marks omitted.) The district court decision cannot be reconciled with this and thus must be reversed.

## II.    THERE IS NO OTHER BASIS ON WHICH TO AFFIRM THE DECISION BELOW

### A.    DeFrancesco Alleged A Plausible First Amendment Retaliation Claim

The elements of a claim of First Amendment retaliation are well settled: (1) "constitutionally protected" speech, (2) an adverse employment action by the defendant, and (3) that "the protected expression was a substantial motivating factor for the adverse action." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002). DeFrancesco's allegations easily satisfy this test.

1.   ***Goldman's Speech Was Protected.***   The district court only reached the first prong, but even it agreed that "the SAC alleges [DeFrancesco]'s husband's speech was protected under the First Amendment."  (ER 15.)

The First Amendment protects a public employee's right to be free from retaliation for speech on "matters of public concern."  *Ballou v. McElvain*, 29 F.4th 413, 429 (9th Cir. 2022).  This Court has adopted a "liberal construction of what an issue 'of public concern' is under the First Amendment."  *Roe v. City & County of San Francisco*, 109 F.3d 578, 586 (9th Cir. 1997).  Speech is of public concern when it relates to "any matter of political, social, or other concern to the community," as "determined by [its] content, form, and context."  *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 147–48 (1983)).  Of these, the content of the speech is the "greatest single factor" in the analysis.  *Ulrich*, 308 F.3d at 979 (citation omitted).  For speech to be unprotected, it must concern "matters *only* of personal interest."  *Ballou*, 29 F.4th at 429 (citation omitted).

In this case, DeFrancesco alleged that his husband, Goldman, blew the whistle on the fact that President Robbins "rigged the process" and "sabotag[ed]" other candidates to ensure his unqualified "best friend" received the job of running the largest public health organization in the state with an annual budget of over $1 billion and over 500 employees.  As this Court recently reiterated, "when

government employees speak about . . . wrongdoing [or] misconduct . . . by other government employees, . . . their speech is inherently a matter of public concern." *Ballou*, 29 F.4th at 429 (alterations in original) (citation omitted); *see Karl v. City of Mountlake Terrace,* 678 F.3d 1062, 1069–70 (9th Cir. 2012) (employee's speech exposing "significant government misconduct" was a matter of public concern (citation omitted)).

It is immaterial that Goldman was a University employee at the time he spoke out. A "public employee does not forfeit protection against governmental retaliation because he chose to press his cause internally." *Ulrich*, 308 F.3d at 979; *accord Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 749 (9th Cir. 2010). To the contrary, the "public has a strong interest in hearing from public employees, especially because '[g]overnment employees are often in the best position to know what ails the agencies for which they work.'" *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066–67 (9th Cir. 2013) (citation omitted). Although, to qualify for First Amendment protection, "the speech" must be "spoken in the capacity of a private citizen and not a public employee," *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009), "[t]he scope and content of a [speaker's] official duties are questions of fact," *Greisen v. Hanken*, 925 F.3d 1097, 1111 (9th Cir. 2019). Here, it is sufficient that the SAC alleges that Goldman was not complaining about dissatisfaction with his own working conditions or the management style of

Robbins or Dake. Dake was not Goldman's boss, and Goldman's responsibilities vis-à-vis the search committee did not include hiring executives at UAHS, reporting on the qualifications of such executives, or reporting ethical violations of senior University personnel. The SAC thus states a plausible claim that Goldman's speech was protected, as the district court found. *See, e.g.*, *Marable v. Nitchman*, 511 F.3d 924, 932–33 (9th Cir. 2007) (ferry engineer's complaints about corruption by ferry system managers constituted speech by private citizen).

2. ***DeFrancesco Suffered An Adverse Employment Action.*** Appellees have never meaningfully disputed this element. Nor could they. "The denial of even a 'trivial' benefit may form the basis for a First Amendment claim where the aim is to punish protected speech." *Ulrich*, 308 F.3d at 977. DeFrancesco was terminated (ER 30 ¶ 60), which is far more than a "trivial adverse employment action[]." *Ulrich*, 308 F.3d at 977; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977) ("Even though [a plaintiff] could have been discharged for no reason whatever," "he may nonetheless establish a claim" if the decision "was made by reason of his exercise of constitutionally protected First Amendment freedoms"); *Capp v. County of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (a plaintiff can satisfy this element by plausibly alleging "the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity" (citation omitted)).

3.    ***Causation Is Easily Inferred From The Close Proximity Between***
***The Speech and Retaliation.***  On the last element, because "direct evidence of
retaliatory intent [can] rarely can be pleaded in a complaint," an "allegation of a
chronology of events from which retaliation can be inferred is sufficient to survive
dismissal." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).  Consistent
with this requirement, DeFrancesco alleged that he was immediately targeted for
harassment and fired after Goldman engaged in protected speech.  He had not
received a single complaint prior to Goldman's speech.

Nothing more was required.  This Court already concluded that the "facts
DeFrancesco plead[ed] support an inference that he was terminated because he is
married to a person who spoke out against the [Appellees'] actions."  (ER 38.)

* * *

For these reasons, DeFrancesco alleged a plausible claim that Appellees
violated his First Amendment right to be free from retaliation because of his
husband's free speech that withstands qualified immunity.

B.    **The Court Should Also Remand As To President Robbins**

In each motion to dismiss, Appellees have argued that there are no
allegations sufficient to show Robbins shares culpability for Dake's retaliatory
campaign of harassment against DeFrancesco.  The district court has never bought
this argument.  Neither did this Court during the last appeal.  It is contrary to law.

"A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). This "does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). Rather, the participation element requires only "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). "[S]etting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury" is sufficient. *Johnson*, 588 F.2d at 743–44.

Applying these principles, the Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them." *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). A "supervisor need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury.'" *Id.* (citation omitted). "Rather, the supervisor's participation could include his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional

deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'"  *Id.* at 1205–06 (citation omitted).

Thus, DeFrancesco was not required to allege that Robbins harassed and/or terminated him.  The Complaint included numerous well-pleaded allegations that state a plausible claim against Robbins:

- Robbins is, and was for all relevant periods, the President of the University (ER 58 ¶ 6);

- Robbins and Dake are former colleagues and close friends (ER 61–62 ¶ 30);

- Robbins encouraged Dake to apply for the Senior Vice President position, the senior-most executive at UAHS (ER 58–59 ¶ 7; ER 62 ¶ 31);

- Robbins instituted, and then rigged, a search-committee process to hide the fact that Robbins had already offered the position to Dake (ER 62–63 ¶¶ 31–41);

- Robbins told Dake that DeFrancesco's husband was a vocal and firm advocate against Dake, that DeFrancesco was a UAHS executive, and that Dake had the authority to fire DeFrancesco (ER 63 ¶ 42);

- DeFrancesco's husband complained to Robbins on behalf of DeFrancesco, and Robbins said that he would handle the problem and speak with Dake (ER 63–64 ¶ 45); and

- Despite Robbins' claim, Dake continued to harass and undermine DeFrancesco, and terminated him in retaliation for Goldman's opposition to his hiring (ER 64–65 ¶¶ 46–54).

These allegations, which must be assumed true on a Rule 12(b)(6) motion, are sufficient to show that Robbins failed to adequately supervise Dake; that he knew of, and acquiesced in, the alleged constitutional deprivations; and that

Robbins acted with reckless and callous indifference to the rights of DeFrancesco. *Starr*, 652 F.3d at 1205–06.

## CONCLUSION

The Court should reverse the decision below and remand for further proceedings.

DATED: December 8, 2023      MILLER BARONDESS, LLP

By: _____
      DAVID W. SCHECTER
      Attorneys for PLAINTIFF ANTHONY
      T. DEFRANCESCO

653883.3           53

**STATEMENT OF RELATED CASES (CIRCUIT RULE 28-2.6)**

Appellant us not aware of any related case currently pending in the Court. A previous appeal arising out of the same district court case was docketed as No. 21-16530. The Court issued its decision on January 19, 2023 and entered the mandate terminating that appeal on February 10, 2023.

DATED: December 8, 2023          MILLER BARONDESS, LLP

By: _____

DAVID W. SCHECTER
Attorneys for APPELLANT
ANTHONY T. DEFRANCESCO

## CERTIFICATE OF COMPLIANCE RULE 32(a)(7)(c)

Pursuant to Federal Rules of Appellate Procedure, rule 32(a)(7)(c), I certify that the APPELLANT'S OPENING BRIEF is double spaced, with the exception of quotations that are longer than two lines, and headings and footnotes, as permitted by rule 32(a)(7)(c). The brief is proportionately spaced using 14-point Times New Roman typeface.

Relying on my word processor software (MS-Word) to obtain the count, the brief's total word count, excluding the covers, table of contents, table of authorities, statement of related cases, certificate of compliance, and certificate of service, is 12,529.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

DATED: December 8, 2023          MILLER BARONDESS, LLP

By: _____
           DAVID W. SCHECTER
           Attorneys for APPELLANT
           ANTHONY T. DEFRANCESCO